## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GENGSHU SCOTT HE,**
*for himself and for his minor children,*
8409 Hayden Lane
Annandale, Virginia 22003-1126,

*and*

**JUN ZHANG,**
*for herself and for her minor children,*
8409 Hayden Lane
Annandale, Virginia 22003-1126,

*and*

**WENQING ZHANG,**
8409 Hayden Lane
Annandale, Virginia 22003-1126,

*and*

**RONG ZHANG,**
8409 Hayden Lane
Annandale, Virginia 22003-1126,

        *Plaintiffs,*

        v.

**ANTHONY BLINKEN,**
United States Secretary of State,
*in his official capacity,*

   **Serve:**
   U.S. Department of State
   The Executive Office (L/EX)
   Office of the Legal Adviser, SA-17
   600 19th Street, N.W.  Suite 5.600
   Washington, D.C. 20522

**Case No.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Attn:  Alicia Frechette, Executive Director

Matthew M. Graves
United States Attorney for the
    District of Columbia
501 Third Street, N.W.  Fourth Floor
Washington, D.C.  20001
Attn:  Civil Division Docket Clerk

Lee J. Lofthus
Assistant Attorney General for
    Administration
United States Department of Justice
Justice Management Division
950 Pennsylvania Avenue, N.W.
Room 1111
Washington, DC 20530,

*and*

**MICHAEL THOMAS PEART,**
23565 Christina Ridge Square
Ashburn, Virginia 20148-5753

**Serve:**
Matthew M. Graves
United States Attorney for the
    District of Columbia
501 Third Street, N.W.  Fourth Floor
Washington, D.C.  20001
Attn:  Civil Division Docket Clerk

Lee J. Lofthus
Assistant Attorney General for
    Administration
United States Department of Justice
Justice Management Division
950 Pennsylvania Avenue, N.W.
Room 1111
Washington, DC 20530,

*and*

**KENNETH ANTHONY VELEZ, JR.,**
1800 North Kent Street
Arlington, Virginia 22209

    **Serve:**
    Matthew M. Graves
    United States Attorney for the
      District of Columbia
    501 Third Street, N.W.  Fourth Floor
    Washington, D.C.  20001
    Attn:  Civil Division Docket Clerk

    Lee J. Lofthus
    Assistant Attorney General for
      Administration
    United States Department of Justice
    Justice Management Division
    950 Pennsylvania Avenue, N.W.
    Room 1111
    Washington, DC 20530,

        *Defendants.*

## COMPLAINT

1.     Plaintiffs,  Gengshu Scott He ("HE") (pronounced "Huh"), his wife, Jun Zhang, and her parents, Wenqing and Rong Zhang, all naturalized citizens or permanent residents of the United States born in China to Chinese parents, hereby file their complaint for all relief, however denominated, at law or equity, including attorneys' fees and costs, available to Plaintiffs and each of them arising out of Defendants' willful and malicious disregard of Plaintiffs' lawful rights and privileges, summarized as follows:

(a)    HE seeks all relief to which he is entitled as against Defendant Anthony Blinken in his official capacity as United States Secretary of State ("State Department"), arising out of the State Department's unlawful employment discrimination and retaliation against HE based on his race and national origin, and on his disability during the height of the COVID-19 pandemic, under federal Title VII1 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), under the federal Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("Rehabilitation Act") (which incorporates prohibitions on and remedies for unlawful discrimination and retaliation from title I of the federal Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* ("ADA")), and under common law; and

(b)    All Plaintiffs, including HE (for  himself and for his minor children), seek all relief to which each may be entitled as against Defendants Michael Thomas Peart ("Peart") and Kenneth Anthony Velez, Jr. ("Velez") arising out of Peart's and Velez's trespass and violation of Plaintiffs' rights and protections under the Fourth Amendment to the United States Constitution to be free of unreasonable search and invasion as Plaintiffs settled in to begin to celebrate Chinese New Year at their home in Annandale, Virginia, on the late afternoon of February 21, 2021, on which afternoon Plaintiffs were safely quarantined in their home to protect themselves from visitors during the COVID-19 pandemic, and to ensure that safety had posted conspicuous signs outside their home, including one on the front door, in letters observable from the street: "COVID-19: SELF-ISOLATING; No Visitors Allowed; Deliveries Leave at Door"; and

(c)     HE seeks all relief to which he may be entitled as against Peart to compensate HE arising out of Peart's assault and battery of HE at HE's home on the late afternoon of February 21, 2021, during the height of COVID-19 in Virginia.

**JURISDICTION, VENUE, AND PARTIES**

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action involves one or more federal questions on the deprivation of HE's rights under federal law, including Title VII and the Rehabilitation Act, and on the deprivation of all Plaintiffs' rights under the Fourth Amendment to the United States Constitution. This Court has jurisdiction over HE's claims under common law pursuant to 28 U.S.C. § 1367. HE's claim for attorney's fees and costs is permitted by the enforcement provisions of Title VII, 42 U.S.C. § 2000e-5(k). Plaintiffs' claims for attorney's fees under the Fourth Amendment is permitted by 42 U.S.C. § 1981a.

3.      Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because, *inter alia*, this judicial district is the judicial district in which HE worked and would have continued to work but for the alleged unlawful employment practices alleged herein and pursuant to 28 U.S.C. § 1391(e)(1)(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

4.      This Court has personal jurisdiction over all Defendants, and each of them, because the State Department, at which Peart and Velez worked during all times relevant to this complaint, has its headquarters in this district at 2201 C Street, N.W., Washington, D.C. 20520.

5.      HE, a citizen of the United States residing at 8409 Hayden Lane, Annandale, Virginia, 22003, was born in China to Chinese parents.  HE was employed by the State Department from on or about March 24, 2014, to May 23, 2020, and from November 8, 2020, to on or about July 2, 2021.  Along with his wife, co-Plaintiff, Jun Zhang, HE parents two elementary school-age, minor children at their home in Annandale, Virginia.

6.      Jun Zhang, a citizen of the United States residing at 8409 Hayden Lane, Annandale, Virginia, 22003, was born in China to Chinese parents. Along with her husband, co-Plaintiff, HE, Jun Zhang parents two elementary school-age, minor children at their home in Annandale, Virginia.

7.      Wenqing Zhang, a permanent resident of the United States married to Rong Zhang, resides at 8409 Hayden Lane, Annandale, Virginia, 22003, and was born in China to Chinese parents. Wenqing Zhang is the father of Jun Zhang.

8.      Rong Zhang, a permanent resident of the United States married to Wenqing Zhang, resides at 8409 Hayden Lane, Annandale, Virginia, 22003, and was born in China to Chinese parents. Rong Zhang is the mother of Jun Zhang.

9.      The State Department, an executive federal agency, employed HE from on or about March 24, 2014, to May 23, 2020, and from November 8, 2020, to on or about July 2, 2021.

10.     Michael T. Peart is and, at all times relevant to the complaint, was an agent working for the State Department in its Bureau of Diplomatic Security.

11.     Kenneth Anthony Velez, Jr., is and, at all times relevant to the complaint, was an agent working for the State Department in its Bureau of Diplomatic Security.

12.     At all times relevant to this complaint, the State Department employed more than 100 persons in this district alone.

**CONDITIONS PRECEDENT**

13.     Conditions precedent to the filing or maintenance of this action, if any, have been satisfied by HE, have been waived by Defendants, or each of them, or are otherwise excused.

14.     On or about May 21, 2021, HE filed a charge of discrimination with the State Department's Office of Civil Rights and, through that Office, with the United States Equal Employment Opportunity Commission ("EEOC"), which opened the charge as EEO Case No. DOS-0178-21.

15.     HE's charge, as summarized by the EEOC, stated: "Because of your race, national origin, disability, and as acts of reprisal, retaliation, or both, you were discriminated against when you were subjected to a hostile work and living environment, which the Department of State endorsed, permitted, or ratified, characterized, but not limited to, derogatory comments, false allegations, intimidation, threats, assault, non-consensual and unsafe meeting and unwanted touching, and invasion of privacy, including at least one an unauthorized attempt to access your medical records, an unauthorized and unwarranted trespass and search of your family home, and intimidation of you and your extended family while your extended family, including your minor children, were inside the home celebrating Chinese New Year."

16.     HE filed his charge within 300 days of the occurrence of one or more of the alleged unlawful employment practices that violated Title VII and the Rehabilitation Act.

17.    As of the filing of this Complaint, neither the State Department nor the EEOC had issued a final decision on HE's charge.  42 U.S.C. § 2000e-16(c).

**FACTS**

18.    HE was born on January 31, 1982, in Nanjing, China to Chinese parents.

19.    In 1992, HE and his mother emigrated the United States to join HE's father, who had emigrated the year before.

20.    HE became a naturalized citizen of the United States on July 3, 2002.

21.    By race, HE is neither Caucasian nor white, and HE is not treated in America as Caucasian or white.

22.    In America, HE is perceived and treated by others as Chinese and/or Asian.

23.    HE was perceived and treated by the State Department as Chinese and/or Asian.

24.    At all times relevant to this complaint, HE wrote and understood English, and spoke American English with a Chinese accent.

25.    HE grew up in central Philadelphia, Pennsylvania, where he attended the public schools.  HE took ESL classes in parallel to his elementary school classes for three years. HE was an honors student through high school and participated and held positions in the Debate Club, Diversity Club, Yearbook Club, Physics Club, and Math Olympics. HE received awards and recognition in Math, Physics, and Sciences.  HE was in the lacrosse team and tennis team in high school.  HE was accepted to multiple colleges upon graduation (including Ivy League schools) and decided to attend Penn State University due to its cost and proximity to his home.

26.    HE attended Penn State University on scholarship, and graduated from Penn State in May 2003 with degree in Computer Science.

27.    HE then attended Johns Hopkins University on a full scholarship (with stipend from the federal government) and completed a post-graduate science program there with honors in December 2005.

28.    HE completed a post-graduate business program with honors at Georgetown University (all on sponsorship), attending class in evening, and completing the program in May 2012.

29.    HE started federal government employment with the United States Department of Commerce in February 2006 as an IT Specialist programming applications and databases.  This job involved HE's securing clearance for a position of public trust prior to his start. In 2008, HE received a promotion at the Department of Commerce for superior qualification and performance in 2008.

30.    HE accepted a promotional (GS-13) position with Department of Homeland Security in March 2012 to audit and safeguard the federal government's information systems. Prior to starting this job, HE secured security clearance categorized as Top Secret/Sensitive Compartmented Information ("TS/SCI"), one of the highest security clearances known to the federal government.

31.    On or about March 24, 2014, HE accepted a promotional (GS-14) position with the State Department to control and govern information technology investments.  This job involved HE's continuing his TS/SCI clearance.

32.    At all times relevant to HE's employment by the State Department, HE was in the competitive service of the federal government.

33.    In 2015, while working for the State Department, HE applied and received an Incentive Pay bonus by having completed coursework under ISACA's CISA (Certified Information Systems Auditor from the private organization Information Systems Audit and Control Association).  The Incentive Pay is a benefit program paid by the State Department to employees who have the qualifying certification.

34.    In May 2018, HE successfully completed a background investigation review with the State Department's Bureau of Diplomatic Security to renew his TS/SCI clearance.

35.    In 2018, HE applied and received an Incentive Pay bonus for the second time by after having completed coursework under ISACA's CISM (Certified Information Security Manager from the private organization Information Systems Audit and Control Association).

36.    On March 19, 2019, while HE was working at his workstation at the State Department in Washington, D.C., someone slapped him on the shoulder and back.

37.    The slapper was Peart, who said: "There you are, the troublemaker."

38.    Peart said that he was looking for me as one of the "bad troublemakers" at the State Department.

39.    HE asked Peart to identify himself.  Peart responded that he was "a special agent."

40.    Peart told HE that Peart knew that HE was "an immigrant" and that "many immigrants in this country are doing bad things and causing a mess." Peart told HE that Peart hoped that HE "would be a different one."

41.     HE was shocked.

42.     Peart then ordered HE to follow Peart to a room.  HE asked why, and how long Peart needed to see HE.  Peart gave no response.

43.     HE asked to use the restroom.  Peart ignored HE.

44.     HE asked Peart again to be permitted to use the restroom.  Peart then replied: "hurry up," and followed HE into the restroom.

45.     When HE was done in the restroom, Peart escorted HE into a prearranged meeting room where another State Department agent, Brian D. Ostrowski ("Agent Ostrowski"), was waiting for HE.

46.     The interrogation on March 19, 2019, lasted more than two hours, during which time Peart ran an audio recording device of the exchange between Peart, HE, and Agent Ostrowski.

47.     Peart did most of the talking, attempting to bully HE to admit to some wrongdoing that Peart never defined.

48.     Peart questioned HE and commented about HE's immigrant background, about HE's family, and about HE and his wife being of Asian and Chinese descent.

49.     Peart noted and compared HE's status as a former immigrant from China against Peart's own background and upraising.

50.     Peart told HE that HE and his wife "are immigrants to this country, who are lucky and should be grateful."

51.     Peart told HE that "people like me should work hard and appreciate people like him for the opportunities here in the U.S."

11

52.     Peart then referenced one of the several certificates that HE had sought while working at the State Department.  Peart advised HE that the company that issued the certification was "on his side and now it is time for me to admit" some still undefined wrongdoing.

53.     Peart threatened to prosecute and arrest HE if HE did not comply with Peart's demand to confess and provide evidence in support of Peart's accusations.

54.     Near the end of the two hours, Peart returned to HE's status as an immigrant.

55.     HE responded: "What does me and my family being immigrants have to do with anything in this investigation?"  Mr. Peart ignored HE's question and gave no response.

56.     Then Peart, clearly agitated, pulled a chair to get close to HE's face.  Peart demanded that HE "obey and cooperate."

57.     Agent Ostrowski) intervened, telling Peart: "too much."

58.     Agent Ostrowski then stopped the "interview."

59.     Agent Ostrowski left the interrogation room.

60.     While Peart and HE were alone in the room, Peart grabbed HE's arm and demanded that HE sign a non-disclosure agreement for HE's "benefit."  Peart explained that "wrong things were said" on the tape and that that would "confuse any listener."

61.     HE refused to sign.

62.     Peart then stated that, because the audio on the tape may be poor, HE should come to Peart's office the next day to confess.

63.     Peart then demanded that HE sign a paper that Peart had brought, telling HE that it is required for government employees and part of HE's job to cooperate in order to clear up wrongdoing.

64.     HE insisted to Peart that HE did nothing wrong.  HE asked for more information on the accusation that Peart was making.

65.     Because HE felt physically threatened, HE signed without reading the document that Peart had brought with him.

66.     HE requested but never received a copy of the document the HE had signed.

67.     Neither Peart nor Agent Ostrowski reviewed any rights that HE had with respect to the interrogation on March 19, 2019, including HE's right not to be detained without cause, HE's right to stop the interview, and HE's right to have an attorney present.

68.     Peart followed up with calls and emails to HE.

69.     In these calls and emails, Peart wanted HE to meet Peart in person.

70.     Peart demanded that HE confess and produce "evidence" that Peart wanted.  Peart advised HE that Peart needed more evidence to make his case against HE.

71.     In an email to HE dated March 20, 2019, Peart stated: "It's best for both of us if we can resolve this soon."

72.     In a phone call shortly thereafter, Peart told HE that Peart needed HE's cooperation so this "case can wrap up."

73.     Peart told HE that the taped interview was not "ideal" given the exchange about immigration; that Peart wanted HE's cooperation; and that without HE"s cooperation, Peart would make things worse for HE.

74.     At the State Department, HE received superior reviews and awards.  HE received Exceed Expectation (second highest employee rating) for his work performance during 2014, his first year at the State Department.  HE received Outstanding (highest employee rating) for his work performance from 2015 to 2019.  HE received awards in 2015 and 2016 for innovation and leading teams.  In 2017, HE received a Department Meritorious Honor Award for performance controlling and securing IT for the organization.

75.     In early 2020, HE was recruited by the Chief Information Security Officer at the United States Department of Agriculture to manage cybersecurity investments and projects.  HE accepted the offer and left the State Department for the U.S.D.A. in May 2020.

76.     HE was soon thereafter recruited for a promotion to Supervisory IT Specialist by the Chief Information Officer at the State Department's Overseas Buildings Operations to come back to the organization as a Branch Chief supervisor managing over twenty employees and contractors.

77.     The State Department job as Supervisory IT Specialist was a 'mission critical' IT role responsible for teleworking, teleconferencing, troubleshooting support, and later as a mobile device deployment during the COVID-19 pandemic.

78.     HE received an offer letter from the State Department on or about August 19, 2020.

79.     Prior to returning to the State Department, HE experienced a waiting period as the Bureau of Diplomatic Security reviewed and then cleared HE to return to the State Department.

80.     HE returned to the State Department on or about November 9, 2020, after a six-month period successfully working at U.S.D.A.

81.     On February 9, 2021, HE received an email from Peart.  It had been roughly two years since Peart's last email to HE.

82.     In the email on February 9, 2021, Peart stated: "Your 2018 submission of a suspect ISC2 CISSP certificate with your application for Skill Incentive Pay) was declined for criminal prosecution by the Department of Justice."

83.     Peart then accused HE of "MISCONDUCT RELATED TO EVENTS ON THE EVENING OF 11/3," which Peart claimed was part of open administrative investigation against HE.  Peart then sought to compel HE to attend an "official interview."

84.     HE called Peart multiple times to find out more information.  HE was not able to reach Peart through Peart's official work number listed in the State Department Directory, however.

85.     On the afternoon of Friday, February 12, 2021, Plaintiffs (including HE and his minor children) were quarantined in their home, preparing to celebrate Chinese New Year, which was to commence that evening.  HE had strung festive lights outside the home to honor the Chinese New Year.

86.     Plaintiffs were safely quarantined in their home to protect themselves from visitors during the COVID-19 pandemic.

87.     To ensure that safety, Plaintiffs had posted conspicuous signs outside their home, including one on the front door, in letters observable from the street: "COVID-19: SELF-ISOLATING; No Visitors Allowed; Deliveries Leave at Door."

88.     At about 4:00 p.m. on Friday, February 12, 2021, Plaintiffs heard loud banging at the front door of their home, the banging continuing for more than thirty seconds.  The doorbell, which was obvious and was operational, was not used.

89.     HE opened the door.  HE's wife and two children (age 4 and 8) were huddled behind HE.  HE's in-laws, Wenqing and Rong Zhang, were further behind.

90.     All Plaintiffs then witnessed what took place.

91.     HE stood in the threshold of his home's front door, his family behind him.

92.     Two men, wearing dark clothing and darks masks, without any other identifying marks or uniform, were standing on the small front patio of the home.

93.     The men did not identify themselves.

94.     One of the men looked at HE and said: "you did not respond to me."

95.     HE asked if the speaker was Peart, who then confirmed his identity.

96.     Velez identified  himself only as "Ken."

97.     HE then told Peart that HE had responded to Peart, including that very morning; that HE had left a voice message; and the HE had also emailed Peart at 2:48 p.m. that afternoon.

98.     Peart said that he had given HE "enough time to come clean."

99.     Peart stated that he came to HE's home to surprise and "ambush" HE.

100.    HE told Peart that Peart's latest accusation was confusing, and that HE did not know what Peart was referencing.

101.    Peart cursed: "Shit!"

102.    Peart shouted at HE: "Stop playing games, you know what this is about!"

103.    Peart then told HE that HE was a "lucky bastard," which HE understood to be a reference to Peart's email on February 9, 2021, indicating that the Department of Justice rejected Peart's referral of HE to the Department for criminal prosecution.

104.    Peart then reached and grabbed HE's wrist while HE was inside the threshold of his home.

105.    HE pulled back and told Peart to keep his distance and to respect COVID-19 distancing guidelines.

106.    Peart then stated that he wanted to give HE a business card.  HE instructed Peart to place the card on the patio.

107.    Peart cursed again and threw the card on the ground.

108.    Plaintiffs were frightened by Peart's outrageous conduct.

109.    When Peart reached for HE, HE's minor children began to cry, and HE could feel his wife trembling behind him.

110.    Peart demanded that an in-person and on-location interview take place at the State Department. HE asked Peart to make the meeting virtual or to allow HE to respond to questions in writing, which request Peart refused. HE asked Peart to schedule the interview to allow HE time to find a lawyer, which request Peart refused.

111.    Peart said to HE the pandemic was caused "by people like you" and that the pandemic is causing Peart to miss deadlines.

112.    HE  responded that HE did not cause COVID-19.

113.    Peart replied: "COVID-19 is fake news and not a big deal."

114.    Peart and Velez then left the front door area of Plaintiffs' home.  Peart and Velez had not parked their vehicle, if they had one, within sight of Plaintiffs' home.

115.    As Peart and Velez left, HE heard one say: "strange immigrants who still have their Christmas decorations up."

116.    That night, and for several weeks, HE's 4-year-old son wet his bed multiple consecutive nights.  For several weeks neither of HE's minor children were able to sleep alone, and both had nightmares.

117.    Rong and Wenqing Zhang were very scared and concerned about their own and the family's welfare.  They are survivors of the Cultural Revolution in China.  They experienced first-hand the abuse of power.  Peart's and Velez's conduct on February 12, 2021, brought them back to those memories.  Both Rong and Wenqing Zhang experienced insomnia and depression.  They became frightened that, the next time Peart came to their home, Peart would infect the family with COVID-19.

118.    On February 24, 2021, HE wrote to his supervisor, Don Stapula ("Stapula"), by email: "My son is not feeling well and has a fever since last night."  Later during that evening, HE and his wife received an email notice from their son's school that a close-contact student in his

class had tested positive for COVID-19 with a rapid test; and that the positively tested child was in contact with someone from outside of school who tested positive.

119.    On February 25, 2021, HE notified Peart of the COVID-19 situation in HE's family, including the email from the school.  HE advised Peart that HE's family needed to be under quarantine and were at risk of contracting COVID-19.

120.    Peart did not approve HE's request to reschedule the "interview" and did not want further delays.

121.    Peart advised HE that in order for Peart even to consider extending time for the "interview," HE would need to provide the evidence to prove the HE was "guilty."

122.    On March 1, 2021, HE's healthcare provider diagnosed HE with COVID-19, and directed HE to follow CDC guidelines, including quarantining for ten days.

123.    HE was extremely ill from March 6 to March 10, 2021, and was on sick leave from the State Department from March 8 through March 10, 2021.

124.    On March 7, 2021, HE and his wife received a second COVID-19 email from their son's school stating: "We have received the PCR results for the 2nd-grader who was initially tested with a rapid test.  The PCR result was also positive."  The school directed that quarantine for the remaining students at home would continue through March 10, 2021.  The child's pediatrician directed the family to follow CDC guidance and to quarantine due to the close contact with COVID-19 positive students and the symptoms diagnosed.

125.    In the morning on March 8, 2021, upon advice from Stapula, HE filed a harassment complaint with the State Department's Office of Civil Rights ("S/OCR"). On March 9, 2021, Peart emailed Stapula and published HE's son's school and health information.

126.    Stapula responded to Peart advising Peart that HE was teleworking and on sick leave.

127.    Peart asked Stapula for information on HE's medical situation and on HE's sick leave requests.

128.    Peart advised Stapula that, without that information, Peart would be forced to conduct a "welfare check" on HE at HE's home.

129.    On March 15, 2021, the State Department Bureau of Diplomatic Security requested that Stapula turn over HE's health status and sick leave records.

130.    On or about July 2, 2021, HE resigned from the State Department under duress of the continued harassment by the State Department, including through the Bureau of Diplomatic Security and its agents, Peart and Velez.

131.    HE ultimately took a new job with the United States Patent and Trademark Office ("USPTO").  HE lost approximately $11,000 per year by leaving the State Department and taking a job at the USPTO.

132.    HE has suffered mental anguish and distress as HE has been forced by the State Department, through its agents, to think of himself as beneath an average citizen of the United States because of HE's race and national origin.

133.     At all times relevant to this complaint, Defendants, including the State Department through its employees, managers, and agents conducted themselves (i) with evil motive, actual malice, deliberate oppression toward HE; (ii) with intent to injure HE and/or his lawful interests; and/or (iii) in willful disregard for HE's lawful rights and privileges.

134.     At all times relevant to this complaint, Peart and Velez conducted themselves (i) with evil motive, actual malice, deliberate oppression toward Plaintiffs, and each of them; (ii) with intent to injure Plaintiffs, and each of them, and/or their lawful interests; and/or (iii) in willful disregard for Plaintiffs' lawful rights and privileges.

## COUNT I
## EMPLOYMENT DISCRIMINATION UNDER TITLE VII
## 42 U.S.C. § 2000e-16(a)
### (HE only)

135.     HE incorporates by reference and restates here the allegations in Paragraphs 1 through 134 above.

136.     Title VII provides that: "All personnel actions affecting employees or applicants for employment . . . in executive agencies as defined in section 105 of title 5 . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).

137.     HE is a non-white, Asian -American male, of Chinese ancestry and national origin, a member of three different classes of citizens protected by Title VII.

138.     The State Department is an executive agency within the meaning of  42 U.S.C. § 2000e-16(a).

139.    The State Department was aware of that HE is a non-white, Asian -American male, of Chinese ancestry and national origin.

140.    The State Department, through the conduct of one or more its agents, including Peart and Velez, harassed HE to the point of driving HE from his lucrative and prestigious position at the State Department, including through conduct severe and pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

141.    The State Department condoned or ratified the harassment of HE.

142.    The State Department's harassment of HE on the basis of race and national origin made working conditions at the State Department so intolerable that a reasonable person in HE' s position would feel compelled to resign.

143.    As a proximate result of the State Department's harassment of HE on the basis of race and nation origin, HE resigned his position at the State Department.

144.    At all relevant times, HE performed the functions of his job at the State Department competently and was qualified for his position with the State Department.

145.    Yet the State Department treated HE less favorably in his employment than the State Department treated similarly situated personnel who were neither Asian nor of Chinese ancestry and national origin.

146.    The State Department is liable under Title VII for the acts and omissions of its agents and employees.

147.    The State Department violated Title VII in its discrimination of HE on the basis of race and/or national origin, including because HE's race and/or national origin was/were a motivating factor(s) in the State Department's treatment of HE.

148.    The discriminatory employment practices in violation of Title VII and other acts or omissions of the State Department and its agents, supervisors, and employees reflect the State Department's reckless, willful, and wanton indifference or hostility to HE's protected employment rights and status, directly and proximately resulting in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and attorney's fees in bringing this action.

**WHEREFORE**, HE respectfully requests that this Court enter judgment in favor of HE and against the State Department, granting:

A.    Appropriate declaratory and other injunctive and/or equitable relief, including reinstatement, back pay, and restoration of all benefits;

B.    Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.    All economic losses on all claims allowed by law;

D.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

E.    Pre- and post-judgment interest at the lawful rate;

F.    Attorneys' fees, and costs and expenses, as allowed by law; and

G.    Any further relief that this court deems just and proper, and any other relief as allowed by law.

## COUNT II
## RETALIATION IN EMPLOYMENT UNDER TITLE VII
### 42 U.S.C. § 2000e-16(a)
### (HE only)

149.    HE incorporates by reference and restates here the allegations in Paragraphs 1 through 134 above.

150.    Title VII provides that: "All personnel actions affecting employees or applicants for employment . . . in executive agencies as defined in section 105 of title 5 . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).

151.    HE is a non-white, Asian -American male, of Chinese ancestry and national origin, a member of three different classes of citizens protected by Title VII.

152.    The State Department is an executive agency within the meaning of 42 U.S.C. § 2000e-16(a).

153.    The State Department was aware of that HE is a non-white, Asian -American male, of Chinese ancestry and national origin.

154.    The State Department retaliated against HE in violation of Title VII when, upon HE's protest of Peart's conduct to S/OCR, the Bureau of Diplomatic Security continued its

harassment of HE, ultimately forcing HE to resign from the State Department to free himself from the State Department's conduct and to protect his family.

155.    The State Department, through the conduct of one or more its agents, including Peart, retaliated against HE to the point of driving HE from his lucrative and prestigious position at the State Department, including through conduct severe and pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

156.    The State Department condoned or ratified the harassment of HE.

157.    The State Department's retaliation against HE for HE's exercise of his rights under Title VII to be free of unlawful discrimination made working conditions at the State Department so intolerable that a reasonable person in HE' s position would feel compelled to resign.

158.    As a proximate result of the State Department's retaliation against HE, HE resigned his position at the State Department.

159.    At all relevant times, HE performed the functions of his job at the State Department competently and was qualified for his position with the State Department.

160.    Yet the State Department treated HE less favorably in his employment than the State Department treated similarly situated personnel who were neither Asian nor of Chinese ancestry and national origin.

161.    The State Department is liable under Title VII for the acts and omissions of its agents and employees.

162.    The discriminatory employment practices in violation of Title VII and other acts or omissions of the State Department and its agents, supervisors, and employees reflect the State

Department's reckless, willful, and wanton indifference or hostility to HE's protected employment rights and status, directly and proximately resulting in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and attorney's fees in bringing this action.

**WHEREFORE**, HE respectfully requests that this Court enter judgment in favor of HE and against the State Department, granting:

A.      Appropriate declaratory and other injunctive and/or equitable relief, including reinstatement, back pay, and restoration of all benefits;

B.      Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.      All economic losses on all claims allowed by law;

D.      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

E.      Pre- and post-judgment interest at the lawful rate;

F.      Attorneys' fees, and costs and expenses, as allowed by law; and

G.      Any further relief that this court deems just and proper, and any other relief as allowed by law.

**COUNT III**
**EMPLOYMENT DISABILITY DISCRIMINATION**
**UNDER THE REHABILITATION ACT**
**29 U.S.C. § 701, *et seq.***
**(HE only)**

163.    HE incorporates by reference and restates here the allegations in Paragraphs 1 through 134 above.

164.    Section 504(a) of the Rehabilitation Act states that "no otherwise qualified individual [with a disability] in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under any program or activity . . .  conducted by any Executive agency." 29 U.S.C. § 794(a).

165.    Section 504(g) of the Rehabilitation Act provides that: "The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment." 29 U.S.C. § 794(g).

166.    The State Department discriminated against HE on the basis of HE's disability and in violation of the ADA by threatening HE with adverse employment consequences yet knowing that HE was unable to perform his work obligations due to temporary illness from COVID-19.

167.    The State Department discriminated against HE on the basis of HE's disability and in violation of the ADA by threatening HE with adverse employment consequences yet knowing

that one or more members of HE's immediate family had either contracted or had been exposed to COVID-19.

168.    The State Department discriminated against HE on the basis of HE's disability and violation of the ADA by retaliating against HE upon HE's advising the State Department that HE was temporality disabled from performing his work obligations due to HE's contracting COVID-19, one or more members of HE's immediate family having contracted COVID-19, and/or HE's efforts to safeguard himself and his family from the pandemic.

169.    The State Department condoned or ratified the violation of HE's rights under the ADA by one or more State Department agents.

170.    As a proximate result of the State Department's violation of HE's rights under the ADA, HE was forced to resign his position at the State Department.

171.    At all relevant times, HE performed the functions of his job at the State Department competently and was qualified for his position with the State Department.

172.    The State Department is liable under the Rehabilitation Act for the acts and omissions of its agents and employees.

173.    The discriminatory employment practices in violation of the Rehabilitation Act and other acts or omissions of the State Department and its agents, supervisors, and employees reflect the State Department's reckless, willful, and wanton indifference or hostility to HE's protected employment rights and status, directly and proximately resulting in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment

opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and attorney's fees in bringing this action.

**WHEREFORE**, HE respectfully requests that this Court enter judgment in favor of HE and against the State Department, granting:

A.      Appropriate declaratory and other injunctive and/or equitable relief, including reinstatement, back pay, and restoration of all benefits;

B.      Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.      All economic losses on all claims allowed by law;

D.      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

E.      Pre- and post-judgment interest at the lawful rate;

F.      Attorneys' fees, and costs and expenses, as allowed by law; and

G.      Any further relief that this court deems just and proper, and any other relief as allowed by law.

### COUNT IV
### VIOLATION OF FOURTH AMENDMENT RIGHTS
### *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)
### (All Plaintiffs)

174.    Plaintiffs incorporate by reference and restate here the allegations in Paragraphs 1 through 134 above.

175.    The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

176.    Peart and Velez, acting under color of federal law, violated Plaintiffs' rights under the Fourth Amendment on February 12, 2021, by unreasonably, and without a warrant and without probable cause, entering the curtilage of Plaintiffs' homestead, despite clear warning, visible from the street, against such entry, and then rapping on the front door of the home for more than 30 seconds, solely for the purpose of frightening and harassing HE and his family in their home on the eve of Chinese New Year during the COVID-19 pandemic.

177.    Peart and Velez acted recklessly, willfully, and with wanton indifference or hostility to Plaintiffs' rights under the Fourth Amendment.

178.    As a proximate result of their conduct, Peart and Velez caused Plaintiffs psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and attorney's fees in bringing this action.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Peart and Velez, jointly and severally, granting:

A.    Appropriate declaratory and other injunctive and/or equitable relief;

B.    Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain

and suffering on all claims allowed by law in an amount to be determined at trial;

  C.  All economic losses on all claims allowed by law;

  D.  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

  E.  Pre- and post-judgment interest at the lawful rate;

  F.  Any further relief that this court deems just and proper, and any other relief as allowed by law.

**COUNT V**
**COMMON LAW ASSAULT**
**(HE only)**

  179. HE incorporates by reference and restates here his allegations in Paragraphs 1 through 134 above.

  180. On February 12, 2021, while acting in a threatening manner at the threshold of HE's home, Peart intentionally threatened HE with an act that put HE in reasonable fear of imminent physical injury without HE's consent.

  181. As a proximate result of his conduct, Peart caused HE psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and attorney's fees in bringing this action.

  **WHEREFORE**, HE respectfully requests that this Court enter judgment in favor of HE and against Peart, granting:

  A.  Appropriate declaratory and other injunctive and/or equitable relief;

  B.  Compensatory and consequential damages, including damages for

emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

      C.     All economic losses on all claims allowed by law;

      D.     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

      E.     Pre- and post-judgment interest at the lawful rate;

      F.     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**COUNT VI**
**COMMON LAW BATTERY**
**(HE only)**

182.    HE incorporates by reference and restates here the allegations in Paragraphs 1 through 134 above.

183.    On February 12, 2021, while acting in a threatening manner at the threshold of HE's home, Peart intentionally touched HE in a manner and under circumstances that reasonably offended HE and his sense of dignity.

184.    Peart's touching was without excuse and without HE's consent.

185.    As a proximate result of his conduct, Peart caused HE psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and attorney's fees in bringing this action.

**WHEREFORE**, HE respectfully requests that this Court enter judgment in favor of HE and against Peart, granting:

        A.        Appropriate declaratory and other injunctive and/or equitable relief;

        B.        Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

        C.        All economic losses on all claims allowed by law;

        D.        Punitive damages on all claims allowed by law and in an amount to be determined at trial;

        E.        Pre- and post-judgment interest at the lawful rate;

        F.        Any further relief that this court deems just and proper, and any other relief as allowed by law.

### COUNT VII
### COMMON LAW TRESPASS
### (All Plaintiffs)

186.    Plaintiffs incorporate by reference and restates here the allegations in Paragraphs 1 through 134 above.

187.    On February 12, 2021, Peart and Velez entered Plaintiffs' real property without right, invitation, or authority to so and against the clear warning that Plaintiffs had posted on their property to ensure their safety during the pandemic: "COVID-19: SELF-ISOLATING; No Visitors Allowed; Deliveries Leave at Door."

188.    As a proximate result of their conduct, Peart and Velez caused Plaintiffs psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and attorney's fees in bringing this action.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Peart and Velez, granting:

A.    Appropriate declaratory and other injunctive and/or equitable relief;

B.    Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.    All economic losses on all claims allowed by law;

D.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

E.    Pre- and post-judgment interest at the lawful rate;

F.    Any further relief that this court deems just and proper, and any other relief as allowed by law.

### JURY DEMAND

Plaintiffs, and each of them, demand a trial by jury of all issues triable as of right by jury.

Dated:  April 25, 2022                    Respectfully Submitted,
Gaithersburg, Maryland

**ROTBERT BUSINESS LAW P.C**.


By:  /s/ Mitchell J. Rotbert
       Mitchell J. Rotbert

Bar No. 420430
9059 Shady Grove Court
Gaithersburg, Maryland 20877
Phone: (240) 477-4778
Fax: (888) 913-2307
mitch@rotbertlaw.com
*Counsel for Plaintiffs*